**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALICE KLEIMAN        :
32 Balsam Court        :
Holland, PA 18966       :
             :
    Plaintiff,      :  CIVIL ACTION
   v.         :
             :  CASE NO.: _____
MEDRINA, LLC        :
401 N. Michigan Avenue, Suite 1200  :
Chicago, IL 60611       :
   and        :  **JURY TRIAL DEMANDED**
INTEGRATED REHAB CONSULTANTS :
FLORIDA, PLLC d/b/a MEDRINA  :
401 N. Michigan Avenue, Suite 1200  :
Chicago, IL 60611       :
   and        :
INTEGRATED REHAB CONSULTANTS, :
PLLC d/b/a MEDRINA     :
401 N. Michigan Avenue, Suite 1200  :
Chicago, IL 60611       :
   and        :
MERCER BUCKS MEDICAL    :
ASSOCIATES P.C. d/b/a FIRST DOCS :
1411 Woodbourne Rd      :
Levittown, PA 19057      :
   and        :
INSPERITY PEO SERVICES, L.P.   :
19001 Crescent Springs Drive    :
Kingwood, TX 77339      :
   and        :
DR. SANJAY BHATIA, M.D.    :
1411 Woodbourne Rd      :
Levittown, PA 19057      :
             :
    Defendants.     :
             :

**CIVIL ACTION COMPLAINT**

Plaintiff, by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1.      This action has been initiated by Alice Kleiman (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against Medrina, LLC, Integrated Rehab Consultants Florida, PLLC d/b/a Medrina, Integrated Rehab Consultants PLLC d/b/a/ Medrina, Mercer Bucks Medical Associates, P.C. d/b/a First Docs and Dr. Sanjay Bhatia (*hereinafter* collectively referred to as "Defendants," unless indicated otherwise) for violations of Title VII of the Civil Rights Act of 1964- 42 U.S.C. §2000e ("Title VII"), the Pennsylvania Human Relations Acts- 42 P.S. §951, et. seq. ("PHRA) and breach of contract.  Plaintiff was discriminated against because of her gender and retaliated against because of her complaints of discrimination.  Defendants also engaged in breach of contract.  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

**JURISDICTION AND VENUE**

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. Any state claims amended herein or included would be proper under this Court's ancillary or supplemental jurisdiction to hear state claims arising out of the same common nucleus of operative facts as those set forth in Plaintiff's federal claims.

3.      This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this District because the actions underlying this case occurred in this District and Defendants are deemed to reside where they are subject to personal jurisdiction.

## PARTIES

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult female residing in Holland, Pennsylvania.

7.      Defendant Medrina LLC ("Medrina") is a company that provides board-certified doctors and other medical personnel or providers to work within nursing facilities, inpatient rehabilitation facilities, and other third-party locations to supplement medical needs of such facilities.  It is headquartered at the above-captioned address.

8.      Defendant Integrated Rehab Consultants Florida, PLLC ("IRCF") provides board-certified doctors and other medical personnel or providers to work within nursing facilities, inpatient rehabilitation facilities, and other third-party locations to supplement medical needs of such facilities.  It is headquartered at the above-captioned address.

9.      Defendant Integrated Rehab Consultants, PLLC ("IRC") provides board-certified doctors and other medical personnel or providers to work within nursing facilities, inpatient rehabilitation facilities, and other third-party locations to supplement medical needs of such facilities.  It is headquartered at the above-captioned address.

10.      Defendant Mercer Bucks Medical Associates, P.C. d/b/s First Docs ("MBMA") provides board-certified doctors and other medical personnel or providers to work within nursing facilities, inpatient rehabilitation facilities, and other third-party locations to supplement medical needs of such facilities.  It is headquartered at the above-captioned address.

3

11. Defendant Insperity PEO Services, L.P. ("Insperity") is a company that performs human resources, payroll, benefits, and compliance services for Defendants. It is headquartered at the above-captioned address.

12. Defendant Dr. Sanjay Bhatia is the President of MBMA and is based out of the above-captioned address.

13. Defendants should be considered Plaintiff's joint employer because they jointly controlled the terms and conditions of Plaintiff's employment  For example:

(a) Defendants Medrina, IRCF and IRC hired Plaintiff and had authority to control the terms and conditions of Plaintiff's employment;

(b) Defendants MBMA and Insperity paid Plaintiff, appear on her pay stubs/W-2s and had control over the terms of her compensation and benefits;

(c) Defendant MBMA controlled Plaintiff's day-to-day activities, job duties, assignments and had authority to discipline and/or terminate Plaintiff;

(d)  These entities have overlapping and/or common ownership, management, financial controls, business relationships, employees, policies and payroll functions;

(e)  Defendant Bhatia, on behalf of MBMA, entered into an employment contract with Plaintiff whereby he was required to comply with the provisions set forth therein.

14. At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

15. Plaintiff exhausted her administrative remedies regarding her Title VII and PHRA claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), dual filing it with the Pennsylvania Human Relations Commission ("PHRC") and filing this Complaint within 90 days of receiving a right-to-sue letter from the EEOC.

4

## FACTUAL BACKGROUND

16.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

17.     Plaintiff is a 44-year-old female.

18.     Plaintiff has a Physician Assistant Degree from Philadelphia University.

19.     Plaintiff is a licensed physician assistant in Pennsylvania and New York and has acquired nearly two decades of experience as a physician assistant.

20.     Plaintiff was hired by Defendants in or about March 2023 but her start date was on or about July 21, 2023.

21.     Throughout her employment with Defendants, Plaintiff worked as a physician assistant.

22.     Plaintiff was qualified for the job, as she possessed the relevant skill and knowledge for the position.

23.     Plaintiff was based out of Defendants' Woodbourne Road Levittown, PA location.

24.     Plaintiff was supervised by Dr. Danielle Steinmetz and Sarah Hatchel (VP of Clinical Operations).

25.     Plaintiff was assigned by Defendant to perform physician assistant duties with various third-party medical providers, including but not limited to Richboro Rehab, Brookdale Rehab, Heartis Assisted Living and Neshaminy Manor.

26.     Throughout her employment, Plaintiff performed her job well, was issued praise for her work and was not issued any discipline.

27.     Defendants' business is primarily operated by men, with very few females in upper management.

28. Defendants appear to focus on male recruitment, male retention, and male transfers (disfavoring female medical staff).

29. Defendants also favor male employees.

30. Throughout Plaintiff's employment, she observed and/or learned that several male personnel were the subject of complaints from medical facilities.

31. Despite these complaints and/or requests for removal, these male providers were not terminated.

32. Instead, the male providers were merely transferred to other facilities.

33. For example, but not intended to be an exhaustive list:

a. Dr. Hiten Patel (male) was disliked at Statesman Health but was not terminated. Instead, he was removed and then transferred to another site;

b. Dr. Collier (male) was disliked at Tulip Special Care but was not terminated. Instead, he was removed and then transferred to another site;

c. Dr. RJ Murray (male) was disliked at Richboro Rehabilitation but was not terminated. Instead, he was removed and then reassigned to another site.

34. In or about July 2024, Plaintiff was informed that she was being removed from working at Neshaminy Manor and terminated from employment with Defendants.

35. Plaintiff disputed this action because she had performed her job well at Neshaminy Manor.

36. In response, Defendants told Plaintiff that she had done nothing wrong but that the facility leaders at Neshaminy Manor were difficult and often complained about staff.

37. When Plaintiff inquired and/or asked about being transferred to another facility, she was told there were no other roles/positions for her.

38. However, just a few weeks prior to this removal, Plaintiff was offered additional assignments/duties by Defendants' Practice Manager (Ann Santiago).

6

39. When Plaintiff asked about this role, she was told she could not work in it without any explanation.

40. In or about July 2024, Plaintiff expressed complaints of gender discrimination to Defendants, including telling them that she felt like she was being treated unfairly because she is a woman.

41. On or about July 26, 2024, within days of this complaint of discrimination, Plaintiff was terminated and not transferred or reassigned to any other facility.

42. Upon information and belief, there were other physician assistant roles and/or other work available as of July 2024.  However, Defendants did not offer any of them to Plaintiff.

43. Since July 2024, Plaintiff has not been offered and/or hired for any other physician assistant assignments with Defendants, despite her stellar qualifications and the availability of other positions/site assignments.

44. At the time of Plaintiff's termination, her manager, Dr. Danielle Steinmetz, told her she was shocked that Plaintiff had been terminated because Plaintiff had always performed her job well and that she (Steinmetz) was not involved in the decision to terminate Plaintiff.

45. In addition, at or around the time of her termination, an employee of Defendants told Plaintiff that she was fired because she was a strong women and that "if [she] had a penis," she would have been treated better.

46. Plaintiff asserts that she was discriminated against because of her gender and retaliated against for complaining about gender-based mistreatment.

## COUNT I
## Violations of Title VII of the Civil Rights Act of 1964
### (Gender Discrimination and Retaliation)
#### - Against Defendant Entities -

47.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

48.    Plaintiff is a female.

49.    Plaintiff was qualified for her position.

50.    Plaintiff was subjected to disparate and demeaning gender-based mistreatment.

51.    Plaintiff complained about the gender-related discrimination.

52.    Defendant failed to appropriately investigate or remedy the discrimination.

53.    Plaintiff suffered adverse employment actions when she was removed, terminated and not reassigned, transferred and/or rehired for any other positions/roles.

54.    These actions constitute violations of Title VII.

## COUNT II
## Violations of the Pennsylvania Human Relations Act ("PHRA")
### (Gender Discrimination and Retaliation)
#### - Against All Defendants –

55.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

56.    Plaintiff exhausted her administrative remedies under the PHRA by dual filing her EEOC Charge with the PHRC and waiting at least one year since that filing to assert these claims.

57.    The conduct, as set forth in Count I, also constitutes violations of the PHRA.

**COUNT III**
**Breach of Contract**
**- Against Defendants MBMA and Bhatia –**

58. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

59. In or about 2023, Plaintiff entered into an employment agreement with Defendants MBMA and Bhatia. *See* Employment Agreement attached hereto as "Exhibit A."

60. One of the provisions of this agreement (at page 9, paragraph 4(a)) required Defendant MBMA/Bhatia, upon termination of Plaintiff's employment, to provide a termination notice to Plaintiff, including "the specific termination provision herein relied upon" and to set forth in "reasonable detail the facts and circumstances claimed to provide a basis for termination of [Plaintiff's] employment…" Exhibit A at p. 9-11, ¶¶ 4(a) and 5(m).

61. Defendants failed to comply with this provision because they did not provide a termination notice to Plaintiff or set forth, in reasonable detail, the factual circumstances of the reasons for her termination.

62. Thus, Defendants breached the employment contract.

63. Plaintiff suffered damages as a result of this breach.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

B. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their

willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D.      Plaintiff is to be awarded any and all damages as a result of Defendants' breach of contract, including but not limited to compensatory damages, consequential damages, liquidated damages and/or equitable remedies;

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.      Plaintiff is to receive a trial by jury as requested in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq. (91538)
Jeremy M. Cerutti, Esq. (200276)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com
jeremy@karpf-law.com

Dated: May 1, 2026

10

# Exhibit A

**EMPLOYMENT AGREEMENT**

This Employment Agreement (this "*Agreement*") is made and entered into as of March 30th, 2023 by and between Mercer Bucks Medical Associates, P.C., a Pennsylvania professional corporation ("*Practice*"), and Alice Cotler, a Pennsylvania resident ("*Provider*"). Capitalized terms used but not otherwise defined in the body hereof have the meanings assigned to such terms in Section 7.

A.   Practice is engaged in the provision of professional medical services in the Commonwealth of Pennsylvania, and Provider is licensed to practice as a physician assistant in the Commonwealth of Pennsylvania.

B.   Practice desires to employ Provider as an employee of Practice, and Provider desires to enter into this Agreement with Practice and to be employed by Practice, in each case on the terms set forth herein.

C.   During Provider's employment with Practice, Provider will have access to each Group Company's confidential, proprietary, and trade secret information and contact with customers, patients, vendors, and other Persons with whom the Group Companies maintain goodwill. The parties believe that it is desirable and in the best interests of Practice to protect the confidential, proprietary, and trade secret information and goodwill of the Group Companies, to prevent unfair competition by employees and former employees of Practice following separation of their employment with Practice and to secure cooperation from employees and former employees with respect to matters related to their employment with Practice.

In consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Term. Practice will employ Provider, and Provider will serve Practice, on an at-will basis for a period beginning on July 31st, 2023 and ending on the Termination Date (such period, the "*Term*").

1.   Positions, Duties and Responsibilities.

(a)   Positions and Duties. Practice will employ Provider, and Provider will serve Practice as a physician assistant providing professional medical services, under the supervision of a physician designated by Practice from time to time ("*Supervising Physician*"), to patients of Practice as directed by Practice as reflected in Practice's operating and compliance Policies (as defined below), Provider's licensing and Provider's professional medical judgment ("*Services*").

(b)   Standard of Performance. Provider will be employed on a Full-Time Basis (as defined below) and will devote Provider's full current and customary business time and attention to the business and affairs of Practice, including as much of Provider's time, skill, labor, and attention to the affairs and activities of Practice as Provider determines may be required by Practice to best serve the interests of Practice's patients and to handle such administrative and supervisory responsibilities as may be assigned to Provider from time to time. Provider will serve Practice faithfully and to the best of Provider's ability in a diligent, trustworthy, businesslike, and efficient manner and will comply with all policies, practices, and procedures of Practice as are in effect from time to time for the conduct of its employees (collectively, "*Policies*"); provided that the means and the manner by which Provider's duties will be performed will be determined by Provider's independent medical judgment, and Provider will render such duties and Services hereunder in accordance with sound medical practices and in conformance with all applicable laws. Provider will support, promote, and participate in Practice's quality assessment or performance improvement, utilization review, outcomes assessment, risk management, compliance or education programs. Provider will use Provider's best efforts to promote the interests, prospects, condition (financial and otherwise) and welfare of Practice. Without limiting the generality of the foregoing, during

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

the Term, Provider will not, without the prior written approval of Practice, render medical services on behalf of any Person other than the Group Companies; provided that Provider may, following prior written notice to Practice, (i) serve on association and corporate boards of charitable and non-charitable organizations or (ii) perform unpaid community service, or charitable, civic or community activities; in the case of each of clauses (i) and (ii), so long as such service does not, individually or in the aggregate, materially detract from the performance of Provider's duties to Practice hereunder or conflict with Provider's obligations hereunder.

(c)    Schedule. As an exempt employee, Provider will provide Services to Practice, at one or more skilled nursing facilities or Practice offices, for five days per week (Monday through Friday), on a schedule to be determined, fixed, and periodically changed or modified by Practice (in consultation with Supervising Physician) in its sole discretion (such schedule, a "*Full-Time Basis*").

(d)    Fees and Billing for Services. Provider acknowledges and agrees that (i) any and all Professional Fees for Services provided during the Term belong to Practice, and Provider will have no right or claim to any portion of such Professional Fees, except as otherwise provided herein; (ii) as a condition of Provider's employment, Provider hereby assigns to Practice any right Provider might have from time to time to bill any third-party payor, including medical insurance companies, Medicare, Medicaid, or other state and federal health care programs, for Services rendered by Provider during the Term; (iii) Practice will submit these billings in Practice's name, and Provider is precluded from billing any third-party payor for Services pursuant hereto during the Term, unless required by a third-party payor, in which event, Provider will bill such Services with the understanding that all fees generated from such billings will belong to Practice, and Provider will immediately remit such revenue to Practice; (iv) Provider will accept all third-party plans offered or administered by third-party payors as directed by Practice; and (v) Provider will not personally bill patients or third-party payors for any Services provided to Practice's patients during the Term. Provider agrees to execute any and all documents deemed reasonably necessary or desirable by Practice to carry out the provisions of this Section 2(d) and does hereby appoint Practice as Provider's attorney-in-fact to execute, deliver or endorse checks, applications for payment, insurance claim forms or other instruments required or convenient, as determined by Practice in its sole discretion, to fully collect, secure or realize all sums lawfully due to Practice, for Services rendered by Provider hereunder (which power of attorney is coupled with an interest, is irrevocable and shall survive expiration or termination of this Agreement).

(e)    Compliance. Provider hereby acknowledges and agrees that (i) Practice is fully committed to ensuring its compliance, and the compliance of its medical providers, staff, and contractors with all applicable rules, regulations and laws promulgated by state and federal governments and by third-party payors relating to the conduct of medical providers employed or retained by Practice and the delivery of Services to patients of Practice, including adherence to all rules, regulations, and laws relating to documentation of and billing for Services rendered, referral practices with other medical service providers, and the general business practices of Practice and its employees and contractors; (ii) Provider will comply with all federal and state statutes, regulations, and rules pertaining to Medicare and Medicaid reimbursement, all requirements of third-party payors, and all Policies that are necessary to ensure continuity of care and obtain appropriate reimbursement for Services; (iii) Provider will complete all records necessary for reimbursement on the date on which Services are performed; (iv) Provider will cooperate fully with Practice's lawful compliance initiatives, programs, directives, and other activities, including (A) cooperating with Practice's efforts to educate and train all of its medical providers, contractors, and staff; (B) conducting audits of medical or billing records or other appropriate compliance reviews or inquires; and (C) instituting any corrective action as determined by Practice when it identifies compliance issues; (v) Provider's Services will satisfy the applicable standard of care whenever providing Services hereunder or whenever making recommendations to Practice concerning the delivery of medical care to its patients; (vi) Provider will maintain a full and unrestricted license to practice as a physician

2

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

assistant in all states or jurisdictions where Provider practices and appropriate permits for dispensing medications (including all permits required to prescribe narcotics and controlled substances); and (vii) Provider will use Provider's reasonable best efforts to remedy any such breach or violation.

      2.      Compensation; Benefits; Expenses.

      (a)      Compensation. During the Term, as compensation for Provider's performance of Services, Practice will pay to Provider, in accordance with Practice's payroll Policies, (i) a base salary of $120,000 per annum (prorated for partial years) (the "*Base Salary*") plus (ii) a monthly productivity bonus equal to the amount by which the product of Provider's total work relative value units ("*wRVUs*") for the prior month multiplied by $16 (the "*RVU Rate*") exceeds the prorated Base Salary for such month (provided that (A) Provider must remain employed hereunder through the date such productivity bonus is payable in accordance with Practice's payroll Policies to receive such productivity bonus; and (B) Practice reserves the right to adjust the RVU Rate annually as may be required due to changing market conditions or Provider's performance).

      (b)      Leave. During the Term, Provider will be entitled to 15 vacation days per year of the Term (prorated for partial Term years) (the use and accrual of which are subject to Practice's Policies) and other leave pursuant to, and in accordance with, Practice's Policies.

      (c)      Employee Benefits. During the Term, Provider will be entitled to participate in Practice's employee benefit plans in effect from time to time, for which (i) physician assistant of Practice generally are eligible and (ii) Provider has satisfied the applicable eligibility requirements. Practice reserves the right to add, terminate, or amend any existing or future plans, Policies, programs or arrangements.

      (d)      Expenses. Practice will reimburse Provider for all reasonable out-of-pocket business expenses, including travel expenses, incurred by Provider while performing the Services during the Term. Such reimbursement will be subject to Practice's Policies for expense pre-approval, verification, documentation, and reimbursement.

      (e)      Medical Malpractice Insurance. Practice will secure medical malpractice insurance coverage for Provider through Practice's group insurance policy at limits and levels Practice determines appropriate for the Commonwealth of Pennsylvania and subject to the terms and conditions of such policy, which are available upon request, and will be on a claims-made basis but will provide for continuing claims-made coverage of Provider's work on behalf of Practice in the event of termination of this Agreement for any reason (i.e., no tail coverage will be required for Provider at termination of this Agreement).

Provider's Representations. Provider hereby represents, warrants, covenants to, and agrees with Practice that: (a) the execution, delivery and performance hereof by Provider does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Provider is a party or by which Provider is bound; (b) Provider is not subject to or bound by any employment or severance agreement with, or any non-compete, non-solicit, confidentiality or other restrictive agreement with or restrictive covenant to, any other Person that will prevent, restrict, or otherwise interfere with Provider's employment with Practice or the performance of Provider's duties and responsibilities hereunder; (c) upon the execution and delivery hereof by Practice, this Agreement will be the valid and binding obligation of Provider, enforceable in accordance with its terms, except to the extent enforcement may be affected by Laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance, and other equitable remedies; (d) Provider does not possess, has not used or disclosed to any Group Company or otherwise since Provider's termination from Provider's prior employer, and will not use or disclose, any confidential information or trade secrets of any prior employer; (e) Provider has returned to each prior employer any and all

3

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

materials, whether in hard copy or electronic format, that contain any confidential information or trade secrets of such prior employer; (f) in providing the Services, Provider will use only information that is generally known and used by persons with training and experience comparable to Provider's own, that is common knowledge in the industry, that is otherwise legally in Provider's possession or the public domain, or that is Confidential Information; (g) Provider, to the best of Provider's knowledge and good faith belief, has not engaged in any other conduct that would lead any prior employer to pursue any legal action against Provider, any Group Company, or any of their respective past, present, or future members, equityholders, partners, managers, directors, officers, employees, or agents; (h) Provider is able to provide proof to Practice, within three (3) days after the date hereof, that Provider is eligible to work in the United States in compliance with the Immigration Reform and Control Act; (i) Provider is in good standing with all applicable government and professional authorities applicable to the Services in the Commonwealth of Pennsylvania; (j) Provider, to the best of Provider's knowledge and good faith belief, is not currently and has not been the subject of any inquiry, investigation, examination, audit, or proceeding by any local, state, or federal regulatory authority or third-party payor; (k) Provider holds a full and unrestricted license to practice as a physician assistant in the Commonwealth of Pennsylvania and all other states or jurisdictions where Provider practices and appropriate permits for dispensing medications (including all permits required to prescribe narcotics and controlled substances); (l) Provider is board certified or board eligible in internal medicine or family medicine; (m) Provider has held professional malpractice insurance providing extended coverage to Provider for periods prior to the Term in the following amounts: at least $1,000,000 per incident and at least $3,000,000 in the aggregate; (n) Provider's license to practice as a physician assistant in any state has never been suspended, revoked, or voluntarily suspended in lieu of disciplinary proceedings; (o) Provider has never been formally reprimanded, sanctioned, or disciplined by any licensing board or state or local medical society or any specialty board; (p) Provider has never been denied membership or reappointment of membership on the medical staff of any hospital, skilled nursing facility, inpatient rehabilitation facility, or similar facility; (q) Provider's medical staff membership or clinical privileges have never been suspended, curtailed or revoked by the medical staff or governing body of any healthcare provider based on Provider's incompetence, violation of professional standards, or criminal acts; (r) Provider has never voluntarily surrendered Provider's medical staff membership or clinical privileges, or withdrawn Provider's application for same, in lieu of an investigation or discipline; (s) Provider has never been denied membership, provider status, or credentialing by a medical group, health plan, HMO, PPO, or other healthcare delivery entity or system or ever had such membership or provider status terminated or not renewed based on Provider's incompetence, violation of professional standards, or criminal acts; (t) Provider has never been sanctioned or fined by the Officer of the Inspector General of the United States Department of Health and Human Services or similar governmental authority; (u) Provider has never been excluded from participation in Medicare, Medicaid, or any other state or federal health care program; and (v) neither Provider nor any members of Provider's immediate family, as defined in Section 1877 of the Social Security Act ("**Stark**"), has any ownership interest in, or financial relationship with, any Person that is a source of referrals to, or receives referrals from, Provider or Practice.

3.    Provider's Covenants.

(a)    Disclosures. Provider will promptly after becoming aware disclose to Practice the following matters, occurring at any time during the Term: (i) any malpractice suit, claim (whether or not filed in court), settlement, settlement allocation, judgment, verdict or decree against Provider; (ii) any investigation or disciplinary, peer review or professional review, proceeding or action instituted against Provider by any licensure board, hospital, medical school, health care facility or entity, professional society or association, third-party payor, peer review or professional review committee or body or governmental agency; (iii) any criminal complaint, indictment or criminal proceeding in which Provider is named as a defendant; (iv) any investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against Provider involving or related to (A) billing improprieties by Provider, (B) violations of the rules of the Medicare or Medicaid programs by Provider, or (C) potential violations of any federal or

4

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

state law prohibiting kick-backs, fee splitting, false claims, or referrals to entities or individuals with which Provider or Provider's immediate family has a financial or ownership interest, including Stark; (v) any dependency on, habitual use or episodic abuse of alcohol or controlled substances or any participation in any alcohol or controlled substance detoxification, treatment, recovery, rehabilitation, counseling, screening or monitoring program by Provider; (vi) any credible allegation, or any investigation or proceeding based on any credible allegation, against Provider, of violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree), relating to the practice of medicine; (vii) any denial or withdrawal of an application by Provider in any state for licensure as a physician assistant, for medical staff privileges at any hospital or other health care entity, for board certification or recertification, for participation in any third party payment program, for state or federal controlled substances registration, or for malpractice insurance; and (viii) any formal patient complaint made to Provider, or relayed to Provider, directly or indirectly.

        (b)      Work Product.

        (i)      General. Provider will keep full and complete written records (the "**Records**"), in the manner prescribed by Practice, of all Work Product. As between Provider and Practice, the Records are the sole and exclusive property of Practice, and Provider will surrender them upon the termination of employment or upon Practice's request. All Work Product that is a work of authorship is deemed a "work made for hire" in accordance with the U.S. Copyright Act, and Provider agrees that Practice will be the sole owner of all Work Product and all underlying rights therein without any further obligations to Provider.

        (ii)      Assignment. If the Work Product, or any portion thereof, is deemed not to be work made for hire, Provider hereby irrevocably conveys, transfers and assigns to Practice, all of Provider's right, title, and interest in and to such Work Product, including the right to receive all past, present, and future proceeds and damages therefrom. In addition, Provider hereby unconditionally waives any so-called "moral rights" and any other non-assignable rights with respect to such Work Product, including any and all currently existing and future monetary rights in and to the Work Product and all other rights that may issue thereon, including any rights that would otherwise accrue to Provider's benefit by virtue of Provider being an employee of or other service provider to Practice. Provider will, at any time during and subsequent to the Term, make such applications, sign such papers, take all rightful oaths, and perform all acts as may be reasonably requested from time to time by Practice with respect to the Work Product. Provider will also execute assignments to Practice (or its designee) of such applications and give Practice and its attorneys reasonable assistance (including the giving of testimony) to obtain, protect, enforce, or defend the Work Product for Practice's benefit, all without additional compensation to Provider from Practice, but entirely at Practice's expense. Provider appoints Practice as Provider's agent and grants Practice a power of attorney for the limited purpose of executing all such documents with respect to Work Product. Nothing in this Agreement, will impair or restrict the rights of any patients of Practice to access any information to which they are entitled by applicable laws, or to direct patient materials to any person (including Provider) to whom patients are entitled by applicable laws. Without limiting the foregoing, upon and after termination, (A) Provider is entitled to copies of patient charts and records upon a specific request in writing from a patient; and (B) Provider will have full access to copy patient records for any reasonable purpose, such as in the event of a malpractice action or administrative investigation proceeding against Provider, for medical research, or to compare a new case with an old one.

        (c)      Disclosure; Publication. During and after the Term, whether upon Practice's request or voluntarily, Provider and Provider's heirs, assigns, and representatives (to the extent known to such Persons) will promptly disclose to Practice, or its designee, all Work Product that Provider has created or contributed to during the Term, regardless of the nature of that knowledge, and regardless of whether such Work Product, or any aspect of such Work Product, has been described, committed to writing, or

5

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

reduced to practice, in whole or part, by any other Person. Except as required for performance of Provider's work for Practice or as authorized in writing by Practice, Provider (i) will not publish or submit for publication, or otherwise disclose to any Person other than Practice, any data or results from Provider's work on behalf of Practice without the prior written consent of Practice; (ii) will not remove any Work Product from Practice's premises, other than in the course of providing Services; and (iii) will hold all Work Product in trust for Practice and deliver it to Practice upon request and in any event at the end of the Term.

(d)    Ventures. If during the Term Provider is engaged in or associated with the planning or implementing of any project, program, or venture involving any Group Company and another Person, all rights in the project, program, or venture will belong to such Group Company and will constitute a corporate opportunity belonging exclusively to such Group Company. Except as agreed in writing by such Group Company or its affiliates and Provider, Provider will not be entitled to any interest in such project, program or venture or to any commission, finder's fee, or other compensation in connection therewith (other than the compensation to be paid to Provider pursuant to Section 3).

(e)    Non-Disclosure of Confidential Information. At the time Provider executes this Agreement, Practice will immediately provide Provider with the Confidential Information and, thereafter, during the Term, Practice will continue to provide Provider with additional Confidential Information along with special training with respect to, among other things, the Group Companies' methods of operation among other things. Provider recognizes that Provider has had, or will have, access to, and knowledge of, Confidential Information. Provider acknowledges that the Confidential Information is valuable, proprietary and confidential to the Group Companies, that the Group Companies have paid substantial consideration and incurred substantial costs to acquire or develop, sort, assemble, or maintain the Confidential Information, and that reasonable efforts have been put forth by the Group Companies to maintain the secrecy of such Confidential Information. Provider will treat the Confidential Information as valuable, proprietary, and confidential regardless of whether any Person would consider it valuable, proprietary, and confidential. Provider will not, at any time during the Term and thereafter (except that Provider is required to hold any Confidential Information that is not a "trade secret" (as defined under any applicable state's Uniform Trade Secrets Act and any other applicable "trade secret" laws) in confidence only for the maximum extent permitted by applicable law), (i) disclose, divulge, or make known to any Person or use any Confidential Information (other than in the performance of Provider's duties and responsibilities hereunder or with the prior written consent of Practice and, if required by law, the patient to whom the Confidential Information relates); (ii) permit any Person to examine or make copies of any documents or electronic records that contain or are derived from Confidential Information (other than in the performance of Provider's duties and responsibilities hereunder or with the prior written consent of Practice and, if required by law, the patient to whom the Confidential Information relates); or (iii) otherwise appropriate for Provider's own benefit or the benefit of any other Person other than the Group Companies any Confidential Information. Provider agrees that upon termination of Provider's employment hereunder (or if earlier requested by Practice) Provider will turn over to the Group Companies all Confidential Information of whatever nature, including written documents and computer records, containing Confidential Information kept by Provider or in Provider's possession, whether originals or copies. Notwithstanding any other provision hereof to the contrary, (i) pursuant to 18 USC Section 1833(b), Provider will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; provided that 18 USC Section 1833(b) does not, however, preclude the trade secret owner from seeking breach of contract remedies; or (ii) nothing herein precludes Provider from disclosing Confidential Information that Provider is compelled to disclose under applicable legal requirement or legal proceeding (including any audit or arbitration); provided that if Provider becomes so compelled to disclose any Confidential Information, then Provider will, if legally permitted, provide

6

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

Practice with written notice thereof (to the extent not legally prohibited) and reasonably cooperate with Practice so that Practice may seek, at Practice's sole expense, a protective order or other appropriate remedy or waive compliance with the terms hereof (subject, in each case, to legal requirements to the contrary).

(f)        Non-Competition. During the Restricted Period, Provider will not, directly or indirectly, as an employee, independent contractor, agent, principal, representative, equityholder, advisor, partner, officer, member, director, or manager, or in any other capacity, on Provider's behalf or on behalf of another Person (i) engage in any business activities in the Business Territory that compete with the business of any Group Company, (ii) perform any services in the Business Territory for any Person that competes with the business of any Group Company or to whom during the Term any Group Company has provided services; or (iii) except during the Term for the benefit of any Group Company, engage in or perform any outpatient services in the Business Territory, whether or not related to the Business; provided that nothing in this Section 5(f) will prohibit Provider from (i) owning or purchasing, directly or indirectly, not more than 2% of any class of securities of a publicly traded company that is engaged, directly or indirectly, in a business that competes with the business of any Group Company; or (ii) if a patient with whom Provider maintains a provider-patient relationship has an Acute Illness at the time of termination hereof, providing continuing care and treatment to that specific patient during the course of such patient's Acute Illness (provided further that, in such situations, Provider will terminate the provider-patient relationship with such patient at the conclusion of the patient's Acute Illness).

(g)        Non-Solicitation. During the Restricted Period, Provider will not, directly or indirectly, as an employee, independent contractor, agent, principal, representative, equityholder, advisor, partner, officer, member, director, or manager, or in any other capacity, on Provider's behalf or on behalf of another Person (other than during the Term on behalf of any Group Company), (i) solicit for the provision of medical services any Person who is, or during the two years prior to such solicitation has been, a patient of any Group Company; or (ii) solicit for hiring, employment, or engagement, hire, employ, or engage any Service Provider or Former Service Provider; provided that nothing in this Section 5(g)(ii) will restrict Provider solely from engaging in a general solicitation not specifically directed at any Service Provider or Former Service Provider so long as, for the avoidance of doubt, Provider does not, directly or indirectly, hire, employ, or engage any Service Provider or Former Service Provider who or that responds to such general solicitation.

(h)        Non-Disparagement. Provider will not, at any time, in any manner, directly or indirectly, disparage, defame, or denigrate any Group Company, or any of their respective past, present, or future directors, managers, partners, officers, employees, or independent contractors, whether to the public, the media, or any other Person; provided that nothing in this Section 5(h) will restrict Provider from giving truthful testimony or evidence in any proceedings, arbitration, mediation, or litigation.

(i)        Acknowledgments. Provider agrees that the terms of employment set forth in this Section 5 (i) are in consideration for the employment offered to Provider by Practice and such other good and valuable consideration received and acknowledged by Provider to be adequate and sufficient, including the disclosure to Provider, as described below, of Confidential Information (including trade secrets); (ii) are appropriate and reasonable, in view of the nature of the Business and Provider's employment with Practice and knowledge of the Business; and (iii) if enforced according as written, will permit Provider to earn a reasonable living in commercial activities unrelated to the Business satisfactory to Provider. Provider further covenants that Provider will not initiate any challenge to the reasonableness or enforceability of any of the restrictions set forth in this Section 5. In the event that any such restrictions are held by any court of competent jurisdiction to be in any respect unreasonable, the courts so holding may limit to the extent necessary the territory to which they pertain or the period of time in which they operate. The remaining provisions will not be affected, but will, subject to the discretion of such court, remain in full force and effect and any invalid or unenforceable provision will be deemed (without further action on the part of the

7

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

parties hereto) modified, amended, and limited, to the extent necessary to render the same valid and enforceable to the maximum extent permissible. If Provider violates any restriction to which the Restricted Period applies, then the Restricted Period shall be extended by one day for each day that Provider is found to have been in violation of such restriction.

(j)    Cooperation. Upon the receipt of reasonable notice from Practice (including outside counsel), Provider agrees that while employed by Practice and thereafter, Provider will, at Practice's sole cost and expense, and except for any disputes, proceedings, arbitration, mediation or litigation between Provider and any Group Company: (i) reasonably respond and provide information with regard to matters in which Provider has knowledge as a result of Provider's employment with Practice; (ii) provide reasonable assistance to each Group Company and its representatives in defense of any claims that may be made against any Group Company related to the period of Provider's employment with Practice; and (iii) reasonably assist each Group Company in the prosecution of any claims that may be rightfully made by any Group Company, to the extent that such claims may relate to the period of Provider's employment with Practice. Provider agrees to promptly inform Practice if Provider becomes aware of any lawsuits involving such claims that are filed against any Group Company. Provider also agrees to promptly inform Practice (to the extent that Provider is legally permitted to do so) if Provider is asked to assist in any investigation of any Group Company (or its actions), regardless of whether a lawsuit or other proceeding has then been filed against any Group Company with respect to such investigation. If Provider is required to provide any services pursuant to this Section 5(j) following the termination of Provider's employment with Practice, then any request for such cooperation will take into account Provider's business commitments to a subsequent employer. Practice will pay or reimburse Provider, in accordance with the Policies, for all reasonable out-of-pocket expenses incurred by Provider in complying with this Section 5(j).

(k)    Return of Records and Property. Upon termination of Provider's employment with Practice or at any time upon Practice's request, in addition to all other obligations under this Section 5, Provider will promptly deliver to Practice any records and other property of any Group Company in Provider's possession or under Provider's control, including manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, source codes, data, tables or calculations and all copies thereof, documents that in whole or in part contain any Work Product or Confidential Information of any Group Company and all copies thereof, and keys, access cards, access codes, passwords, credit cards, personal computers, telephones, and other electronic equipment belonging to any Group Company.

(l)    Remedies. Provider agrees that the remedy at law for any breach or threatened breach of the requirements of this Section 5 will be inadequate and that any breach or attempted breach would cause immediate and permanent damages to each Group Company in an amount which will be difficult to ascertain. Accordingly, Provider agrees and consents that in the event of any breach or threatened breach of this Section 5, in addition to any and all other legal and equitable remedies available to any Group Company for such breach or threatened breach (including a recovery of damages), each Group Company will be entitled to seek preliminary or permanent injunctive relief and without the necessity of proving actual damages by reason of such breach, and, to the extent permissible under applicable law, Provider agrees not to raise an objection to the appropriateness of such relief in the event of any such breach or argue that money damages would be sufficient; provided, however, that (i) nothing contained herein will be construed as prohibiting any Group Company from pursuing any other rights or remedies available for any such breach or threatened breach, (ii) failure to seek any or all remedies in one case does not restrict any Group Company from seeking any remedies in another situation, and (iii) such action by any Group Company will not constitute a waiver of any of the Group Companies' rights.

4.    Termination.

8

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

(a)     By Practice. Notwithstanding any other provision hereof, Practice may terminate Provider's employment at any time for Cause or without Cause, effective as of the Termination Date, upon delivery of a Termination Notice to Provider.

(b)     By Provider. Notwithstanding any other provision hereof, Provider may terminate Provider's employment with Practice at any time, for any reason or for no reason, effective as of the Termination Date, upon delivery of a Termination Notice to Practice. Practice may require that Provider not come to work during the notice between the delivery of such Termination Notice and the Termination Date and may assign one or more of Provider's duties to one or more other individuals.

(c)     Death. Provider's employment with Practice will terminate immediately upon Provider's death.

(d)     Obligations. Upon termination of Provider's employment with Practice for any reason, Provider (or in the event of Provider's death, Provider's beneficiary), will be entitled to receive, paid in accordance with Practice's payroll Policies, all earned but unpaid Base Salary for Services provided through the Termination Date. Subject to applicable law, none of Provider or any of Provider's beneficiaries will be entitled to any other compensation or benefits of any kind upon termination hereof.

(e)     Provider's Failure to Give Required Notice. Provider and Practice each acknowledge and agree that (i) the notice period required for Provider's termination hereof pursuant to Section 6(b) is necessary to ensure Practice has sufficient time to find an adequate replacement should Provider terminate this Agreement; (ii) Provider's failure to give such notice would be a breach hereof that materially damages Practice; (iii) in the event of such failure, Provider will pay to Practice, as liquidated damages, and not as a penalty, within 30 days after the Termination Date, $25,000.00; and (iv) such amount of liquidated damage is a fair and reasonable estimate of an amount that would be otherwise difficult to estimate or ascertain.

5.     Definitions. The following terms have the meanings set forth in this Section 7:

(a)     "*Acute Illness*" means an affliction, injury, or illness that requires hospitalization or constant medical supervision and is not expected to resolve within two weeks of the onset of signs or symptoms.

(b)     "*Business*" means the business of any Group Company conducted, or contemplated to be conducted, at any time during the Term.

(c)     "*Business Territory*" means any facility in which Provider provides Services hereunder, any facility that is an affiliate thereof, any outpatient clinic in which Provider provides Services hereunder, and a 5-mile radius of any of the foregoing.

(d)     "*Cause*" means Provider's: (i) material non-performance, or gross or willful misconduct or gross negligence in the performance, of Provider's duties herein; (ii) refusal or failure to adhere in all material respects to any lawful Policy or follow any lawful directive of Practice; (iii) engagement in conduct that discriminates or harasses another employee or contractor of Practice on the basis of gender, race, color, creed, religion or sexual orientation, and Practice's President determines such conduct is reasonably likely to result in a lawsuit or claim before a governmental authority against Provider or Practice; (iv) being charged with, indictment for, conviction of, or plea of *nolo contendere* to a felony; (v) misappropriation (or attempted misappropriation) of any of the funds, Confidential Information, or personal property of any Group Company; (vi) commission of any other act or omission involving theft, moral turpitude, misappropriation, embezzlement, or fraud; (vii) material breach or nonperformance of any of Provider's representations, warranties, covenants, agreements, or obligations hereunder; (viii) other

9

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

gross or willful misconduct or gross negligence that has caused or is likely to cause an adverse impact (monetary, reputational, or otherwise) to any Group Company or on Provider's ability to effectively perform Provider's duties with Practice; (ix) inability to obtain or maintain medical malpractice insurance; (x) license to practice as a physician assistant in any state is revoked or terminated; (xi) right or license to use or prescribe any controlled substance or drug is revoked or terminated; or (xii) exclusion or other declaration of ineligibility to participate in any federal or state health care programs, including Medicare and Medicaid, or any other payment program in which Provider or Practice is a participating provider.

(e) "*Confidential Information*" means confidential and proprietary information of the Group Companies or otherwise concerning the Business, including individually identifiable and other information regarding Practice's patients, contents of manuals, procedures, methods of doing business, the identity and details of referral sources, suppliers, and other business relationships, information contained in the books and records of the Group Companies, trade secrets and patient lists, acquisition, development, expansion, financial (including the revenues, costs, or profits associated with any products or procedures), marketing, strategic, transition, transformation, and other business information and plans of the Group Companies, research and development, computer programs, sources of supply, cost and pricing information, employee information (including personnel, payroll, compensation and benefit data, and plans), and books and records, methods of doing business, Policies, procedures, including all such information recorded in manuals, memoranda, projections, minutes, plans, drawings, designs, formula books, specifications, computer programs and records, whether or not legended or otherwise identified as confidential information, as well as such information that is the subject of meetings and discussions and not recorded and other information that relates to any of the Group Companies, or customers, patients, payors, referral sources, suppliers or contractors of any of the Group Companies or any other Person with whom any of the Group Companies has a business relationship or owes a duty of confidentiality; provided that Confidential Information will not be deemed to include information that (i) is or becomes generally available to the public or the medical profession other than as a result of an impermissible disclosure hereunder by Provider; (ii) was within Provider's possession prior to it being furnished by or on behalf of any Group Company pursuant hereto; (iii) becomes available to Provider from a source not known by Provider to owe a duty of confidentiality to a Group Company; (iv) is or was independently developed by Provider without use of any of the information furnished by or on behalf of any Group Company in connection with this Agreement; or (v) constitutes personal information of any patient treated by Provider.

(f) "*Former Service Provider*" means any Person who or which was a Service Provider during the 180 days prior to the applicable attempt to solicit, hire, employ, or engage.

(g) "*Group Company*" means Medrina, Inc., any direct or indirect subsidiary thereof, any medical practice managed by any of the foregoing, and any successor or assign of any of the foregoing.

(h) "*Person*" means any natural person, general partnership, limited partnership, corporation, trust, limited liability company, or other association or entity, or the United States of America or any other nation, state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

(i) "*Professional Fees*" means any and all professional fees generated by Provider during the Term in performance of Services hereunder, including any financial support provided by a hospital or healthcare entity.

(j) "*Restricted Period*" means the period beginning on the first day of the Term and ending on the second anniversary of the Termination Date.

(k) "*Service Provider*" means any Person who or which is an employee or independent contractor of (i) any of the Group Companies or (ii) any personal service corporation or other personal

10

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

corporation owned by a physician or physicians, which corporation has or had a contractual relationship with any of the Group Companies in the prior 9 months.

(l)    "*Termination Date*" means if Provider's employment is terminated (i) by Provider's death, the date of Provider's death; (ii) by Practice with Cause, the date specified in the Termination Notice; (iii) by Practice other than with Cause, the date specified in the Termination Notice, which for the purposes of this clause (iii) may be no earlier than the 60th day following the date such Termination Notice is delivered to Provider (unless such termination is due to Provider's inability to satisfy applicable credentialing requirements, in which case any date may be specified in the Termination Notice); or (iv) by Provider the date specified in the Termination Notice, which for the purposes of this clause (iv) may be no earlier than the 60th day following the date such Termination Notice is delivered to Practice; provided that Practice may, in its sole discretion, make such Termination Date effective earlier than the date set forth in such Termination Notice.

(m)    "*Termination Notice*" means a written notice that will indicate the specific termination provision herein relied upon and will set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of Provider's employment under the provision so indicated.

(n)    "*Work Product*" means any and all promotional and advertising materials, catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, ideas, inventions, discoveries, methodologies, improvements, work products, developments, works of authorship, trade secrets, processes, inventions, compositions, and any technology, know-how, Confidential Information, or intellectual property (including rights in any trademarks, service marks, trade secrets, copyrights, and patents) made, developed, conceived of, or reduced to practice by Provider during the Term, in whole or in part, alone or with others during or as a result of Provider's employment with Practice (whether or not conceived, developed, reduced to practice, or created during regular working hours).

6.    Entire Agreement. This Agreement sets forth the entire understanding of the parties regarding the subject matter hereof and thereof and supersedes all prior contracts, agreements, arrangements, communications (including correspondence by electronic transmission), discussions, term sheets, representations and warranties, whether oral or written, between the parties regarding this subject matter.

7.    Assignment. This Agreement is binding upon and inures to the benefit of the heirs, successors, representatives, and assigns of each party, but no rights, obligations, or liabilities of either party hereunder will be assignable by operation of law or otherwise without the prior written consent of the other party.

8.    Amendment; Waivers. This Agreement may be amended or modified only by a writing executed and delivered by both parties. None of the terms hereof will be deemed to be waived or amended by either party unless such a waiver or amendment specifically references this Agreement and is in writing executed and delivered by an authorized representative of the party to be bound. Any such signed waiver will be effective only in the specific instance and for the specific purpose for which it was made or given.

9.    Represented by Counsel. Provider acknowledges that Provider has been provided with the right and opportunity to consult with an attorney or other personal advisor concerning the legal effect hereof and Provider's and Practice's rights and obligations hereunder, and that Provider enters into this Agreement voluntarily.

10.    Notices. Any notice provided for herein (including Termination Notices) must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier (charges prepaid), or sent by confirmed email to: (a)

11

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

if to Practice, Mercer Bucks Medical Associates, P.C., c/o First Docs MSO, Inc., 401 N. Michigan Ave., Suite 1200, Chicago, IL 60611, Attention: Matthew Ray, Email: matt.ray@irehabconsultants.com; (b) if to Provider, 32 Balsam CT Holland PA 18966, Email: Azkleiman@gmail.com; or (c) to such other Person or at such other address as may be designated by a party by written notice served in accordance with the provisions of this Section 12. Notice will be deemed given upon receipt (or refusal of receipt).

11.     Severability. Each section and subsection hereof constitutes a separate and distinct provision hereof. It is the intent of the parties that the provisions hereof be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought. Accordingly, if any provision hereof is adjudicated to be invalid, ineffective, or unenforceable, the remaining provisions will not be affected by such adjudication. The invalid, ineffective, or unenforceable provision will, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective, or unenforceable provision; provided, however, that such amendment will apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

12.     Applicable Law. All matters relating to the interpretation, construction, application, validity, and enforcement hereof, and any disputes or controversies arising hereunder, will be governed by the laws of the Commonwealth of Pennsylvania without giving effect to any choice or conflict of law provision or rule, whether of the Commonwealth of Pennsylvania or any other jurisdiction, that would cause the application of laws of any jurisdiction other than the Commonwealth of Pennsylvania.

13.     Non-Disclosure of Employment Terms. Provider agrees that Provider will keep confidential and not disclose the terms hereof to any Person without the prior written consent of Practice, except to Provider's spouse or personal accountant or attorney, provided that such Person also agrees to maintain the confidentiality of the Agreement. Provider will be responsible for any disclosure by such Person. Provider further represents that Provider has not disclosed the terms hereof to anyone other than Provider's spouse or personal accountant or attorney. This Section 15 does not prohibit disclosure hereof in the following circumstances: (a) if required by applicable law, provided Provider has, if legally permitted, given Practice prompt notice of any legal process and cooperated with Practice's efforts to seek a protective order; (b) if necessary for Provider in respect of legal action against Practice for breach hereof or any other agreements between Provider and Practice or any of the Group Companies; or (c) if made pursuant to Provider's rights under Section 7 of the National Labor Relations Act.

14.     Income Tax Reporting; Withholding. Provider will report all payments made by Practice to Provider hereunder as ordinary income for federal, state, and local income tax purposes. Practice may withhold from any payments made or benefits provided hereunder such federal, state, and local taxes as may be required to be withheld pursuant to any applicable law.

15.     No Strict Construction. Each party hereby agrees and acknowledges that such party has had the full opportunity to consult with counsel and tax advisors of such party's selection in connection with the preparation and negotiation hereof. The parties jointly participated in the negotiation and drafting hereof. The language used herein will be deemed to be the language chosen by the parties to express their collective mutual intent. This Agreement will be construed as if drafted jointly by the parties, and no rule of strict construction will be applied against any Person.

16.     Interpretation. Whenever the term "include" or "including" is used herein, it will mean "including, without limitation," (whether or not such language is specifically set forth) and will not be deemed to limit the range of possibilities to those items specifically enumerated. The words "hereof," "herein," and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision. Terms defined in the singular have a comparable meaning when used in the plural and vice versa. As used herein, the word "or" will not be exclusive, and the masculine, feminine, or neuter

12

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

gender will be deemed to include the others whenever the context so indicates or requires. All references herein to a "party" or "parties" are to a party or parties hereto unless otherwise specified.

17.    Delivery by Electronic Means; Counterparts. This Agreement and any amendments hereto, to the extent signed and delivered by means of a PDF, facsimile machine, or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract will raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

18.    Force Majeure. Neither party will be liable for nor deemed to be in default for any delay, interruption, or failure in performance under this Agreement deemed to have resulted, directly or indirectly, from acts of God, civil or military authority, war, accidents, fires, explosions, earthquakes, floods, riots, civil disturbances, strike, or any similar cause beyond the reasonable control of either party.

19.    Survival. Subject to Section 14, the covenants contained in Sections 5 and 8 through 20 will survive any termination or expiration hereof.

The parties have executed this Agreement as of the date indicated in the first sentence hereof.

MERCER BUCKS MEDICAL ASSOCIATES, P.C.

By: _____
Name: Sanjay P. Bhatia, M.D.
Title: President

_____
Alice Cotler, P.A.

13

Doc ID: 2be0bda328fb800d062e4a10048f3a15bb1efdd4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Alice Kleiman | : | CIVIL ACTION |
| v. | : | |
| Medrina, LLC, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          (  )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          (  )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (x )

| | | |
|---|---|---|
| 5/1/2026 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

10/2024

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: __Defendants place of business__

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1.  Does this case involve property included in an earlier numbered suit?                              Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?   Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?   Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?   Yes ☐

5.  Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.   Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

A.  *Federal Question Cases:*

☐  1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐  2.  FELA
☐  3.  Jones Act-Personal Injury
☐  4.  Antitrust
☐  5.  Wage and Hour Class Action/Collective Action
☐  6.  Patent
☐  7.  Copyright/Trademark
☐  8.  Employment
☐  9.  Labor-Management Relations
☒  10. Civil Rights
☐  11. Habeas Corpus
☐  12. Securities Cases
☐  13. Social Security Review Cases
☐  14. Qui Tam Cases
☐  15. Cases Seeking Systemic Relief **\*see certification below\***
☐  16. All Other Federal Question Cases. *(Please specify)*:_____

B.  *Diversity Jurisdiction Cases:*

☐  1.  Insurance Contract and Other Contracts
☐  2.  Airplane Personal Injury
☐  3.  Assault, Defamation
☐  4.  Marine Personal Injury
☐  5.  Motor Vehicle Personal Injury
☐  6.  Other Personal Injury *(Please specify)*:_____
☐  7.  Products Liability
☐  8.  All Other Diversity Cases: *(Please specify)*_____
        _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

KLEIMAN, ALICE

## DEFENDANTS

MEDRINA, LLC, ET AL.

**(b)** County of Residence of First Listed Plaintiff    Bucks
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Cook
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000)

Brief description of cause:
Violations of Title VII, PHRA and Breach of Contract.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____ DOCKET NUMBER _____

DATE   5/1/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____